UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| STANDARD OFFICE SYSTEMS OF ATLANTA, INC., <br><br> Plaintiff, <br><br> v. <br><br> U.S. EXPRESS LEASING, INC.; EVERBANK FINANCIAL CORP.;[1] and TYGRIS VENDOR FINANCE, INC.,[2] <br><br> Defendants. | Civil Action No. 10-01427 (SDW)(MCA) <br><br> **OPINION** <br><br> January 24 , 2011 |

**WIGENTON**, District Judge.

Before the Court is Plaintiff Standard Office Systems' ("Standard" or "Plaintiff") Motion for Partial Summary Judgment and Defendant Tygris Vendor Finance's ("Defendant" or "Tygris") Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(c). This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a). These Motions are decided without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons below, this Court denies Plaintiff's Motion for Partial Summary Judgment, and grants Defendant's Motion for Summary Judgment in part. Summary judgment as to fraudulent inducement is denied.

---

[1] The parties stipulated to Everbank Commercial Bank's ("Everbank") dismissal, with prejudice, on May 4, 2010.
[2] Although three Defendants are named, there is essentially only one Defendant because on October 22, 2009, Everbank acquired Tygris Vendor Finance ("Tygris"), which formerly did business as U.S. Express Leasing. (Compl. ¶ 4; Carollo Decl. ¶ 2.) Tygris currently operates as a division of Everbank. (Compl. ¶4.) Therefore, the Court's Opinion will refer to only one Defendant.

1

**FACTUAL AND PROCEDURAL BACKGROUND**

      i.    **The Master Purchase Agreement**

Plaintiff Standard "is a document solution company that provides office equipment and document-related services to its customers." (Pl.'s Facts ¶ 1.)  On June 16, 2005, Plaintiff and Defendant, known then as U.S. Express, entered into a Master Purchase Agreement and Assignment of Leases ("MPA").  (Compl. ¶ 10; Pl.'s Ex. A.)

Pursuant to the MPA, Plaintiff could "from time to time [] offer to sell [to Defendant] lease, rental, or finance agreements for equipment and/or software sold or distributed by Seller [Plaintiff] . . . to certain qualified customers . . . of Seller [Plaintiff]."  (Pl.'s Ex. A ¶ 1.)  All the documentation relating to the Leases had to identify Plaintiff "as the owner for such Leases." (Id. at ¶ 9(a).)  The MPA further provided that "[e]ach such financing will be referred to [] a 'Lease'" and would "include[] all of Seller's [Plaintiff] rights, title and interest to the Equipment, the Lease evidencing the financing, [and] all payments under the Lease . . . ." (Id. at ¶ 1.)  At its discretion, Tygris could purchase the lease agreements after it approves them.  (Pl.'s Facts ¶ 4; Pl.'s Ex. A ¶ 2.)  The MPA provided that "[t]o the extent that the transfer of the Leases [to Defendant] is deemed to be other than a sale," Plaintiff "grants to [] [Defendant] a first priority security interest in the leases." (Pl.'s Ex. A ¶ 3.)  Furthermore, Plaintiff assured that Defendant "will have good title or a first priority security interest to all Equipment, free and clear of all liens, claims, security interests and encumbrances on . . . such equipment under each Lease." (Id. at ¶ 7(e).)  After the sale, Defendant was responsible for "billing, collecting, and administering each lease" with Plaintiff's customers.  (Compl. ¶ 15.)  Plaintiff, on the other hand, would service and provide supplies for the equipment and receive payment from Defendant for its provision of maintenance services.  (Id. at ¶¶ 16, 17.)

There was also a provision in the MPA which required Tyrgris to notify Standard, within twenty days, if the latter breached any of the MPA's provision. (Pl.'s Ex. A ¶ 9(c).) Standard had twenty days, after it was notified, "to cure any breach." (Id.) However, if Plaintiff failed to cure the breach, Defendant could exercise its rights under the MPA's indemnification provision which states that "at USXL's [Defendant] request, [Plaintiff shall] pay the Repurchase Price . . . within ten (10) days after receipt of a written demand from" Defendant. (Id. at ¶ 10.)

### ii.  The Document Leases

On February 28, 2007, Standard entered into a lease agreement with the Document Company, Inc., ("Document") in the amount of $94,495 for Xerox equipment ("Lease 1"). (Pl.'s Facts ¶ 12; Pl.'s Ex. B at 1-3.) Standard asserts that it did not own the equipment, but it "brokered the transaction between the distributor of the photocopying equipment and . . . Document." (Pl.'s Facts ¶ 13.) On that same day, Defendant purchased Lease 1. (Pl.'s Ex. C at 3.) Subsequently, on October 22, 2007, Plaintiff entered into another agreement with Document ("Lease 2") (Lease 1 and Lease 2 are collectively the "Document Leases"). (Pl.'s Ex. C at 1-2.)[3] Similar to Lease 1, Standard did not own the equipment but merely served as a broker in its transaction with Document. (Pl.'s Facts ¶ 16.) Thereafter, Standard sold Lease 2 to Tygris for $86,600. (Id. at ¶ 17; Pl.'s Ex. C at 3.) The total amount of both leases was $181,095. (Pl.'s Facts ¶ 18.) According to the lease agreements for the Document Leases, Plaintiff was "the [o]wner of the equipment" and had "sole title to the equipment (excluding software)." (Pl.'s Ex. B at 2; Pl.'s Ex. C at 2.)

Pursuant to the lease agreement between Standard and Document, the latter was required to make monthly lease payments to Tygris. (Def.'s Facts ¶ 15; Pl.'s Ex. A ¶ 8.) However, on December 4, 2009, Tygris notified Standard that Document had defaulted on Lease 1 and 2.

---

[3] The complaint refers only to Lease 2. (See Compl. ¶ 19.)

3

(Pl.'s Ex. D.)  Also, Defendant asserted that Plaintiff had to repurchase the Document Leases because it had discovered during its investigation of Document's default that Plaintiff did not own the equipment as required by the MPA.  (Id.)  Subsequently, on December 22, 2009, Plaintiff informed Defendant that it had not breached the MPA because "it purchased the equipment and received title to it free and clear from any liens, claims, or encumbrances."  (Pl.'s Ex. E.)  Consequently, on January 19, 2010, Defendant began withholding payments due to Plaintiff on unrelated leases.  (Pl.'s Facts ¶ 28.)  The total amount Tygris withheld from Standard is $144,317.47, which is equal to the repurchase price.  (Id. at ¶ 30.)  On February 4, 2010, Tygris once again insisted Standard repurchase the equipment which are the subject of the Document Leases.  (Id. at ¶ 25.)  The equipment's repurchase price was $144,317.47.  (Id. at ¶ 26.)  Nonetheless, Plaintiff refused to repurchase the equipment because it did not believe the MPA required it to own the equipment.

Subsequently, Plaintiff filed a claim against Defendant alleging breach of contract, (Compl. ¶¶ 22-33), unjust enrichment, (Id. at ¶¶ 34-41), and willful conversion, (Id. at ¶¶ 42-46).  Defendant counterclaimed for breach of contract and fraudulent inducement.  (Pl.'s Answer & Countercl. ¶¶ 27-44.)

**SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).  A fact is

only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law . . . ." Id. at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. The dispute is not genuine if it merely involves "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. Celotex Corp. v. Catrett, 477 U.S. 317, 318 (1986). Once the moving party meets its initial burden, the burden then shifts to the non-movant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations, speculation, unsupported assertions or denials of its pleadings. Shields v. Zuccarini, 254 F.3d 476, 481 (3d Cir. 2001); see also Celotex, 477 U.S. at 324.

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" Marino v. Indus. Crafting Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

## DISCUSSION

### I. Whether Plaintiff was Required to Own the Equipment under the MPA

Plaintiff moves for Partial Summary Judgment because Defendant withheld payments due from leases unrelated to the Document Leases. (Pl.'s Br. 10.) On the other hand, Defendant maintains Plaintiff was required to own the equipment under the MPA; thus, it was entitled to withhold the payments. (Def.'s Br. 1-9.) "[T]he interpretation of a contract is usually a question

5

of law." United States v. Hardwick, 544 F.3d 565, 570 (3d Cir. 2008).  In interpreting a contract, "[t]he court's goal is to ascertain the intention of the parties to the contract as revealed by the language used . . . , the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain."  Borough of Princeton v. Bd. of Chosen Freeholders of Cnty. of Mercer, 333 N.J. Super. 310, 325 (App. Div. 2000), aff'd, 169 N.J. 135 (2001) (internal quotations omitted); see also Carter v. Exxon Co. USA, 177 F.3d 197, 206 (3d Cir. 1999) ("New Jersey's fundamental rule of contract interpretation is that the court is to ascertain the parties' intent from what was written and the surrounding circumstances.").  Therefore, "[a] basic rule of contract interpretation is to read the document as a whole in a fair and common sense manner," Hardy ex rel. Dowdell v. Abdul-Matin, 198 N.J. 95, 103 (2009), "without artificial emphasis on one section . . . ." Bd. of Chosen Freeholders of Cnty. of Mercer, 333 N.J. Super. at 325.  Consequently, the contract "should not be interpreted to render one of its terms meaningless." Cumberland Cnty. Imp. Auth. v. GSP Recycling Co., Inc., 358 N.J. Super. 484, 497 (App. Div. 2003).  "Literalism must give way to context." Bd. of Chosen Freeholders of Cnty. of Mercer, 333 N.J. Super. at 325; see also Wheatly v. Sook Suh, 217 N.J. Super. 233, 239 (App. Div. 1987) ("In construing a contract, a court must not focus on an isolated phrase but should read the contract as a whole as well as considering the surrounding circumstances.").  Additionally, "where the terms of a contract are clear . . . the court must enforce it as written." Cnty. of Morris v. Fauver, 153 N.J. 80, 103 (1998).  The court should not rewrite the contract, Fid. & Cas. Co. v. Carll & Ramagosa, Inc., 243 F. Supp. 481, 484 (D.N.J. 1965), or disregard the parties' intent "to create a new or better contract or to add to, subtract from, modify, or alter any terms of the agreement." Commc'ns Workers of Am., Local 1087 v. Monmouth Ctny. Bd. of Special Servs., 96 N.J. 442, 452 (1984).

6

Plaintiff asserts that it is entitled to partial summary judgment because the MPA permitted it to sell brokered agreements to Defendant. (Pl.'s Br. 10-11.) This Court disagrees. Plaintiff bases its assertion that the MPA permitted it to sell brokered agreements to Tygris on the provision that allowed the sale of finance agreements. (Id. at 11-12.) However, finance agreements are not synonymous with broker agreements. A broker is defined as "[a]n agent who acts as an intermediary or negotiator, espe[cially] between prospective buyers and sellers." BLACK'S LAW DICTIONARY 79 (2nd Pocket ed. 2001). Therefore, "a brokerage contract is a kind of agency contract under which a broker is employed to make contracts of the kind agreed upon in the name and on behalf of the broker's principal . . . ." 12 AM. JUR. 2D Brokers § 1 (2009). On the other hand, a finance agreement is an agreement to raise or provide funds. BLACK'S LAW DICTIONARY 284 (2nd Pocket ed. 2001). Plaintiff's role under these two types of agreements is markedly different. Because these types of agreements are significantly different, the parties would have included a provision for brokerage agreements if they had intended to permit them. Consequently, Plaintiff cannot argue that it was permitted to sell brokered agreements simply because the MPA permitted it to sell finance agreements.

Plaintiff also maintains that the MPA did not require it to own the equipment it sold to its customers because the MPA permitted the sale of finance agreements. (Pl.'s Br. 13.) However, in making this argument, Plaintiff once again erroneously assumes that financing a transaction is identical to brokering a transaction. As stated earlier, those two arrangements are not synonymous or interchangeable. Additionally, although Plaintiff may not own the equipment it finances, it will have a security interest in the equipment. Thus, it will have a property interest in the equipment. See BLACK'S LAW DICTIONARY 630 (2nd Pocket ed. 2001). Therefore,

contrary to Plaintiff's position, its ability to sell finance agreements to Defendants does not imply that it did not need to own the equipment.

Furthermore, a fair reading of the MPA as a whole indicates that Plaintiff was required to own the equipment. For example, Section 9(a) of the MPA states that "[a]ll documentation for Leases will name Seller [Plaintiff] as the owner for such Leases." (Pl.'s Ex. A ¶ 9(a).) However, Plaintiff argues that this provision applies to the Leases and not the lease equipment. (Pl.'s Reply Br. 2.) This argument lacks merit because the MPA specifically defines "Lease" as used in the document to include "all of the Seller's [Plaintiff] rights, title and interest to the Equipment . . . ." (Pl.'s Ex. A ¶ 1.) Therefore, contrary to the Plaintiff's assertions, the Lease does include the lease equipment. Moreover, in compliance with Section 9(a) of the MPA, the lease agreements in the Document Leases assert that Plaintiff is "the [o]wner of the equipment and ha[s] sole title to the equipment (excluding software)." (Pl.'s Ex. B ¶ 3; see also Pl.'s Ex. C ¶ 3.) This provision strongly indicates that Plaintiff was required to own the equipment. Furthermore, the fact that Plaintiff misrepresented on the lease agreements for the Document Leases that it owned the equipment suggests that it was aware that the MPA required it to own the equipment.

In addition, Plaintiff contracted to "irrevocably sell[], assign[] and transfer[] . . . the Leases" to Defendant. (Pl.'s Ex. A ¶ 3.) As stated earlier, the Leases include Plaintiff's interest in the equipment. Plaintiff's assertion that it is not required to own the equipment is at complete odds with the purpose to the MPA because Plaintiff cannot sell, assign or transfer the Leases if it does not have some kind of property interest in it. Nonetheless, Plaintiff maintains that the MPA does not pertain to sales alone. (Pl.'s Br. 14.) This argument lacks merit. The MPA provides that "[t]o the extent that the transfer of the Leases is deemed to be other than a sale . . . [Plaintiff]

[] grants to [] [Defendant] a first priority interest in the Leases." (Pl.'s Ex. A ¶ 3.) However, this provision merely serves as a backup measure in the event a Lease sale lacked an essential requirement. The desired objective, however, is that the transaction be a sale.

Plaintiff further argues that the MPA only required it to give Tygris good title to the equipment. (Pl.'s Br. 14.) Yet, this argument lends credence to Defendant's position that Plaintiff was required to own the property under the MPA. Section 7(e) of the MPA states that Defendant "will have good title or a first priority security interest to all Equipment, free and clear of all liens, claims, security interests and encumbrances . . . ." (Pl.'s Ex. A ¶ 7(e).) It would be impossible for Plaintiff to convey or transfer "good title" to Defendant if it does not have an ownership interest in the property because it cannot transfer or convey an interest greater than what it has. Turick v. Erdmann, 112 N.J. Eq. 261, 263 (Ch. 1933) (one cannot "convey a greater interest than" one owns).

Similarly, Plaintiff's contention that it satisfied its obligations under the MPA because it offered to produce an affidavit showing that Defendant has clear title is unpersuasive. (Pl.'s Br. 16.) Plaintiff alleges that it served as a broker and it did not own the equipment in the Document Leases. (Pl.'s Facts ¶ 13.) Therefore, even if it could proffer evidence showing that Defendant had clear title to the equipment, it would still have breached the MPA because the MPA requires Standard to sell or transfer its "rights, title and interest to the Equipment," (Pl.'s Ex. A ¶ 1), not those of a third party.

### a. Materiality and Waiver of the Breach

Plaintiff contends that even if this Court finds that it breached the MPA, Defendant is not entitled to summary judgment because the breach is immaterial and Defendant waived the breach. (Pl.'s Op. Br. 6.) A breach is material if it "goes to the essence of the contract." Ross

9

Sys. v. Linden Dari-Delite, Inc., 35 N.J. 329, 341 (1961). "When there is a breach of a material term of an agreement, the non-breaching party is relieved of its obligations under the agreement." Nolan v. Lee Ho, 120 N.J. 465, 472 (1990). Here, Plaintiff argues its breach is not material because that was not the cause of Document's default. (Pl.'s Op. Br. 9.) However, the effect of Plaintiff's breach on the Document Leases is irrelevant for the purposes of determining the materiality of the breach. The essential question is whether Plaintiff's breach affected a fundamental aspect of the MPA. As stated earlier, the MPA, read as a whole, required that Plaintiff own the equipment which were the subject of the leases it sold Defendant. Therefore, Plaintiff materially breached the MPA when it sold the Document Leases to Defendant.

Plaintiff also argues that summary judgment should not be granted because Defendant waived the breach. (Pl.'s Op. Br. 6.) The facts here do not indicate that Defendant waived its rights. Waiver "involves the intentional relinquishment of a known right and thus it must be shown that the party charged with the waiver knew of his or her legal rights and deliberately intended to relinquish them." Shebar v. Sanyo Bus. Sys. Corp., 111 N.J. 276, 291 (1988). Plaintiff has failed to establish that Defendant was aware, at the time the Document Leases were sold, that Plaintiff did not own the equipment. Defendant asserts that it only discovered that Plaintiff did not own the equipment when Document defaulted on the leases. (Pl.'s Ex. D.) Additionally, Tygris was not under an obligation to investigate the equipment's ownership. As a result, Plaintiff has not demonstrated that Defendant waived the breach.

### b. Whether Defendant Provided Sufficient Notice

Plaintiff contends that Defendant breached the MPA because it failed to provide notice and an opportunity to cure the alleged breach. (Pl.'s Br. 21.) According to Plaintiff, the MPA required that Defendant submit a letter notifying Standard of the alleged breach and citing the

10

breached provisions. (Id. at 22.) This argument lacks merit. Contrary to the Plaintiff's assertion, the MPA did not specify the form or the content of the notice. It simply provides that "[i]n the event that [] [Plaintiff] is in breach of an obligation . . . [Defendant] will provide notice of breach to [] [Plaintiff] shall have twenty (20) days to cure any breach." (Pl.'s Ex. A ¶ 9(c).) Therefore, Defendant's December 4, 2009, (Pl.'s Ex. D), email was sufficient under the MPA's notice requirement. Additionally, Plaintiff's assertion that it received notice after Plaintiff had begun withholding payments, (Pl.'s Br. 22), is a blatant attempt to mislead this Court. Defendant sent Plaintiff an email on December 4, 2009, after it discovered that the Document Leases were in default. (Pl.'s Ex. D.) Thereafter, on December 16, 2009, and December 22, 2009, Plaintiff and Defendant exchanged additional emails putting the former on notice about the alleged breach. (Pl.'s Exs. D, F.) Hence, Plaintiff was given more than the requisite twenty days to cure the alleged breach.

## II.     Whether Defendant Was Entitled to a Setoff

Plaintiff argues that Defendant is not entitled to a setoff because that common law right is not recognized under New Jersey State law. (Pl.'s Br. 20.) Plaintiff's argument has no merit as New Jersey does recognize the common law right to setoff. See Miah v. Ahmed, 179 N.J. 511, 527 (2004); All Am. Auto Salvage v. Camp's Auto Wreckers, 146 N.J. 15, 28 (1996) (concluding that a bank has common law right to setoff). The doctrine of setoff is an equitable right that "involves an affirmative recovery on a claim that may be independent of the transaction upon which the plaintiff's claim is based." Miah, 179 N.J. at 527 (quoting Beneficial Fin. Co. of Atl. City v. Swaggerty, 86 N.J. 602, 609 (1981)) (internal quotations omitted). The doctrine "allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding the absurdity of making A pay B when B owes A." 20 AM. JUR. 2D

Counterclaim, Recoupment, and Setoff § 6 (1995).  Nonetheless, "[u]nless provided by statute . . . [the doctrine] may be restricted by judicial limitations imposed to uphold a state policy protecting [a certain class of litigants]."  Miah, 179 N.J. at 527 (quoting 20 AM. JUR. 2D Counterclaim, Recoupment, and Setoff § 6) (internal quotations omitted).

In this case there are mutual debts since Plaintiff breached the MPA because it did not own the equipment in the Document Leases.  Moreover, Plaintiff was provided adequate notice of the breach but failed to cure it.  Accordingly, Defendant is entitled to the repurchase price.  On the other hand, Defendant has withheld payments from Plaintiff for services it rendered under the MPA.  However, the MPA is silent with respect to Defendant's right to setoff its losses; therefore, whether Tygris has a right to setoff will depend on the equities present.  Here, there is no state policy protecting litigants like Plaintiff.  Furthermore, public policy does not dictate against permitting a setoff under these circumstances. The repurchase price of $144,317.47 is liquidated, fixed, and undisputed.  (Pl.'s Facts  ¶ 26; Pl.'s Ex. A ¶ 10.)  Therefore, Defendant is entitled to setoff the repurchase price.[4]

Nevertheless, Standard asserts that Defendant's right of setoff is barred by laches and the doctrine of "unclean hands."  (Pl.'s Op. Br. 12).  Laches "is invoked to deny a party enforcement of a known right when the party engages in an inexcusable and unexplained delay in exercising that right to the prejudice of the other party."  Knorr v. Smeal, 178 N.J. 169, 180-81 (2003).  That doctrine does not apply under these circumstances because as stated earlier Plaintiff has not demonstrated that Defendant was aware of the breach at the time Plaintiff sold the Document Leases.  Standard argues that Tygris "unreasonably delayed whether the [] Leases were

---

[4] In light of this Court's conclusion that Defendant is entitled to setoff its claims against Plaintiff, it will not address the issue of whether Defendant is entitled to a recoupment.

brokered." (Pl.'s Op. Br. 12.) This argument is meritless because Defendant was not obligated to investigate the leases under the MPA. Accordingly, there was no unreasonable delay here.

Plaintiff also maintains that Tygris is not entitled to a right of setoff because it wrongfully withheld payments. (Pl.'s Op. Br. 13.) This argument has no basis. Plaintiff breached the MPA when it sold the Document Leases to Tygris. Pursuant to the MPA Plaintiff was under an obligation to repurchase the equipment after receiving adequate notice. Nonetheless, Plaintiff refused to abide by the terms of the MPA. Therefore, Defendant did not "convert" Plaintiff's property because Tygris was entitled to the repurchase price. Plaintiff has not alleged that Defendant withheld an amount in excess of the repurchase price. Consequently, Tygris is not barred by the doctrine of "unclean hands."

**III.     Fraudulent Inducement**

Both Plaintiff and Defendant move for summary judgment on Tygris's fraudulent inducement claim. The elements of fraudulent inducement are: "(1) a material misrepresentation of a presently existing or past fact, (2) made with knowledge of its falsity, (3) with the intention that the other party rely thereon, [and] (4) resulting in reliance by that party to his[/her] detriment." Holton Indus., Inc. v. Anderson, 1989 U.S. Dist. LEXIS 12382, at *15 (D.N.J. Oct. 16, 1989) (quoting Jewish Ctr. of Sussex Ctny. v. Whale, 86 N.J. 619, 624 (1981)). Here, issues of fact exist as to the surrounding circumstances of the MPA. Additionally, a determination of whether Plaintiff made the misrepresentation with the intent that Defendant rely on it presents an issue of fact. See Poulathas v. Atl. City Zoning Bd. of Adjustment, 289 N.J. Super. 310, 313 (App. Div. 1995) (noting that "[i]ntent is an issue of fact."); Eltrym Euneva, LLC v. Keansburg Planning Bd. of Adjustment, 407 N.J. Super. 432, 439 (Law Div. 2008). Consequently, summary judgment is denied to both Standard and Tygris.

## CONCLUSION

For reasons stated above, Plaintiff's Motion for Partial Summary Judgment is DENIED. Defendant's Motion for Summary Judgment is GRANTED in part. Summary Judgment as to fraudulent inducement is DENIED.

**SO ORDERED.**

s/ Susan D. Wigenton<br>**Susan D. Wigenton, U.S.D.J.**

cc:  Madeline Cox Arleo, U.S.M.J.